**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

**EDWIN HART TURNER**                                                          **PLAINTIFF**

**V.**                                         **CAUSE NO. 3:12-CV-00064-CWR-LRA**

**CHRISTOPHER EPPS, COMMISSIONER**
**OF THE MISSISSIPPI DEPARTMENT OF**
**CORRECTIONS IN HIS OFFICIAL**
**CAPACITY, AND EMMITT L.**
**SPARKMAN, SUPERINTENDENT OF**                          **DEFENDANTS**
**THE MISSISSIPPI STATE PENITENTIARY**
**AT PARCHMAN, MISSISSIPPI, IN HIS**
**OFFICIAL CAPACITY**

## TEMPORARY RESTRAINING ORDER

For purposes of the motion for injunctive relief presently before the Court, the principal

question at hand is whether the constitutional guarantee of due process requires a prisoner's

jailers to permit him to present himself for a psychiatric evaluation in preparation for possible

litigation. Holding that it does, and finding that the plaintiff has satisfied the standards governing

the issuance of temporary restraining orders, the Court grants the motion.

## PROCEDURAL HISTORY

Edwin Hart Turner (hereinafter "Turner") is incarcerated at the Mississippi State

Penitentiary in Parchman, Mississippi. A Forrest County Circuit Court jury convicted Turner of

two counts of capital murder in February 1997 and sentenced him to death.[1] The Mississippi

Supreme Court affirmed[2] the circuit court's judgment in February 1999 and denied post-

---

[1] *Turner v. State*, 732 So. 2d 937, 940 (Miss. 1999) ("*Turner I*").

[2] *Id.*, *cert. denied*, 528 U.S. 969 (1999).

1

conviction relief[3] in January 2007. Afterward, Turner's efforts moved to federal court. In February 2010, the U.S. District Court for the Northern District of Mississippi denied[4] Turner's petition for writ of *habeas corpus*, and the Fifth Circuit Court of Appeals affirmed[5] the district judge's decision in February 2011.

      With the exception of his direct appeal in state court, wherein Turner still was represented by trial counsel, each of these efforts has attacked his trial attorneys' assistance as ineffective. Specifically, Turner has offered evidence of longstanding mental illness that, in his view, should have been explored and presented in greater detail as mitigation during the sentencing phase of his February 1997 trial. The Mississippi Supreme Court,[6] the U.S. District Court for the Northern District of Mississippi,[7] and the Fifth Circuit[8] each have held that such evidence would have been merely cumulative of mitigation evidence regarding Turner's psychological history.

      After the United States Supreme Court denied[9] Turner's petition for *certiorari* on January 9, 2012, the State of Mississippi moved the Mississippi Supreme Court to schedule Turner's execution date.[10] One week later, in an effort to arrange an off-site psychiatric evaluation, Turner

---

[3] *Turner v. State*, 953 So. 2d 1063 (Miss. 2007) ("*Turner II*").

[4] *Turner v. Epps*, 2010 WL 653880 (N.D. Miss. 2010) ("*Turner III*").

[5] *Turner v. Epps*, 412 Fed. Appx. 696 (5th Cir. 2011) ("*Turner IV*").

[6] *Turner II*, 953 So. 2d at 1074.

[7] *Turner III*, 2010 WL 653880 at *17.

[8] *Turner IV*, 412 Fed. Appx. at 702-03.

[9] *Turner v. Epps*, ___ S. Ct. ____, 2012 WL 33368 (2012).

[10] Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order and, Preliminary Injunction, and an Expedited Hearing on Plaintiff's Motion for Preliminary

moved the Mississippi Supreme Court for an Order permitting him to present himself for an examination by Dr. Donna Schwartz-Watts and for a PET scan and an fMRI scan.[11] The Mississippi Department of Corrections' Standard Operating Procedures establish that any person obtained by an inmate's attorney for the purpose of evaluating the inmate shall not proceed without a court order, and Turner's motion sought such an order.[12] Turner's motion, citing the Constitutions of the United States and of the State of Mississippi, further requested that the Mississippi Supreme Court "hold[ ] lines 157-62 of MDOC SOP 20-01-01 to be a violation of Mr. Turner's right to due process of law and to meaningful access to the Courts."[13]

However, nine days later on January 26, 2012, the Mississippi Supreme Court entered orders denying[14] Turner's Motion for Expert Access, denying[15] Turner's application for leave to file a successive petition for post-conviction relief, and granting[16] the State's motion to set Turner's date of execution. That court set Turner's execution for thirteen days later: February 8, 2012.

_____

Injunction [Docket No. 4] (hereinafter "Plaintiff's Memo") at 5.

[11] Exhibit 3 to Plaintiff's Motion for Temporary Restraining Order and, [*sic*] Preliminary Injunction [Docket No. 3-3].

[12] Plaintiff's Memo at 3.

[13] Exhibit 2 to Complaint [Docket No. 1-2] at 9.

[14] Exhibit 10 to Plaintiff's Motion for Temporary Restraining Order and, [*sic*] Preliminary Injunction [Docket No. 3-10].

[15] Exhibit 11 to Plaintiff's Motion for Temporary Restraining Order and, [*sic*] Preliminary Injunction [Docket No. 3-11].

[16] Exhibit 2 to Plaintiff's Motion for Temporary Restraining Order and, [*sic*] Preliminary Injunction [Docket No. 3-2].

Having been provided no order permitting expert access from the state's highest court, on January 30, 2012, Turner turned to this Court seeking relief by initiating the instant suit pursuant to Title 42, Section 1983 of the United States Code, against Department of Corrections Commissioner Christopher Epps and Mississippi State Penitentiary Superintendent Emmitt Sparkman in their official capacities (hereinafter collectively "the State").[17] The narrow question presented by the Complaint is not whether Turner is guilty or even whether he should be executed; it is whether the State has violated the United States Constitution by requiring that Turner obtain a court order before he can be seen by a medical professional in anticipation of litigation.  Specifically, Turner argues that by requiring him to obtain a court order before permitting him to meet with a psychiatrist obtained by his attorney, the Mississippi Department of Corrections has violated the component of due process guaranteeing access to courts.

One day after the Mississippi Supreme Court denied the relief he requested, Turner moved this Court to enter a temporary restraining order or preliminary injunction forbidding the Department of Corrections to carry out the scheduled execution until Turner is permitted to meet

---

[17] However, the Mississippi Supreme Court did find that "Turner has failed to exhibit a violation of any federal or state constitutional or statutory right . . . ." Exhibit 6 to Plaintiff's Motion for Temporary Restraining Order and, [*sic*] Preliminary Injunction [Docket No. 3-10]. The State challenges this Court's jurisdiction over Turner's suit. *See* Memorandum in Support of Response in Opposition to Motion for Temporary Restraining Order and Preliminary Injunction [Docket No. 12] (hereinafter "State's Memo") at 6. The single claim raised in Turner's case rests on the question of whether the State has violated his constitutional right to due process, as established by the Fourteenth Amendment. Federal law establishes that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Therefore, jurisdiction lies with this Court. Moreover, Title 42, Section 1983 authorizes federal courts to issue a variety of reliefs including injunctive relief, monetary damages (which is not being requested in this action), and declaratory relief that a particular statute, rule or policy is constitutionally inadequate.

with Dr. Schwartz-Watts.[18]

At the hearing held on this matter on February 3, 2012, the State objected to entry of a preliminary injunction, and Turner conceded that, at this juncture, the only fairly available form of relief is a temporary restraining order.[19]

## ANALYSIS

Temporary restraining orders and preliminary injunctions are extraordinary forms of relief.[20] This observation rises frequently from courts considering requests for such orders, but the enormity of the relief is difficult to overstate.[21] "In essence, a movant for pre-trial, injunctive relief represents to the court that its case is so particularly unusual, the strength of its case so particularly great, and the risk of incurable injury so particularly unbearable that the promise of a typical day of court ultimately will serve no practical purpose."[22] The granting of such relief is left to the sound discretion of the court.[23]

---

[18] Plaintiff's Memo at 3.

[19] On the evening of January 30, 2012, when it first learned of the filing and because of the nature of these proceedings and the relief requested, and notice having been provided to the State, the Court scheduled a conference call with the parties' counsel for January 31. That conference call was held, and with the agreement of the parties, the matter was scheduled for argument at 1 p.m. on February 3.  The State was given until February 2 to file its response to the motion. *See* Minute Entry Dated Jan. 31, 2012.

[20] *Ridgely v. FEMA*, 512 F.3d 727, 734 (5th Cir. 2008).

[21] *See generally* Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2948 (noting that courts describe such requests as "drastic," "extraordinary," and that the requesting party must make a "clear showing").

[22] *Trinity USA Operating, LLC v. Barker*, 2011 WL 2976942, *2 (S.D. Miss. 2011).

[23] *Canal Auth. of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

Therefore, in order to preserve the possibility of a meaningful decision, courts are

empowered by Rule 65 of the Federal Rules of Civil Procedure to enjoin a party's behavior

without a trial on the merits if the movant is able to make four showings:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of
> irreparable injury if in the injunction is not issued, (3) that the threatened injury if the
> injunction is denied outweighs any harm that will result if the injunction is granted,
> and (4) that the grant of an injunction will not disserve the public interest.[24]

These elements are not arbitrary and disconnected; rather, they enjoy a direct relationship

such that the strength of one showing lessens the necessity of another. For example, a movant

with a clear, unchallengeable right to legal relief will have a lighter burden of proof regarding the

risk of irreparable injury; likewise, a party seeking to enjoin behavior that undoubtedly will result

in a wound that no court could possibly heal will be entitled to an injunction even when its

likelihood of success on the merits is less than indisputable.[25]

"The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve

the court's ability to render a meaningful decision on the merits."[26] As a preliminary matter, this

---

[24] *Janvey v. Alguire*, 628 F.3d 164, 174 (5th Cir. 2010); *Herrera v. Collins*, 954 F.2d 1029, 1033 (5th Cir. 1992) (same general standard governs stays of execution). *See also Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005) (same factors govern both temporary restraining orders and preliminary injunctions).

[25] *See Knights of Ku Klux Klan, Realm of Louisiana v. East Baton Rouge Parish Sch. Bd.*, 578 F.2d 1122, 1125 (5th Cir. 1978); *Federal Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 562 (5th Cir. 1987); *Triebwasser & Katz v. AT&T*, 535 F.2d 1356, 1359 (2nd Cir. 1976); *Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp.*, 908 F. Supp. 1180, 1187 (W.D.N.Y. 1995). *See also* Wright, Miller & Kane, *supra*, at § 2951 (courts balance the harms that may be caused by the granting or the denial of injunctive relief; "therefore, when the injury that allegedly will result if the restraining order is denied is very grave, less of a showing is required than if the injury would be slight.").

[26] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985).

6

Court has no difficulty in finding that the second, third, and fourth prongs of the four-step test favor Turner. If the injunction does not issue, then Turner faces not only an irreparable harm but the single most irreparable harm of all: death itself. Additionally, an execution achieved through (what Turner purports to be) an unconstitutional act is a harm that far outweighs any harm incurred by a delay of Turner's execution. And likewise, the Court is satisfied that an injunction, if issued, will not disserve the public interest; to the extent that the State of Mississippi enjoys an interest in putting Turner to death, the opportunity would not be forever lost simply by requiring the Department of Corrections first to permit Turner to meet with a psychiatrist. Assuring that constitutional protections are provided to each of its citizens is not a disservice to the American public.

Furthermore, it must be noted that the second prong – requiring the threat of not merely harm but that of an irreparable harm – weighs strongly in favor of issuing an injunction. The threat of an irreparable harm is "perhaps the single most important prerequisite for the issuance of a preliminary injunction,"[27] and "execution is the most irremediable and unfathomable of penalties[.] . . . [D]eath is different."[28] Given the unique nature of the irreparable harm herein

---

[27] *Barker*, 2011 WL 2976942 at *3 (quoting Wright, Miller & Kane, *supra*, at § 2948.1.).

[28] *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (Marshall, J.). The Fifth Circuit Court of Appeals too has explained that death is different:

> [The death penalty] is different from all other punitive measures in that it is the most exacting disciplinary mechanism available to a society that considers itself civilized and decent. In addition, the termination of human life is the most final and decisive method for inflicting a penalty that can be conceived. It is precisely the inflexible and terminal nature of the death penalty that makes it a matter of exceeding consequence to assure that before such a condemnation the individual receives the full force of the protections and safeguards guaranteed by the Constitution.

presented, this issue persuades heavily in favor of issuing an injunction.

The only remaining question, then, is whether Turner enjoys a substantial likelihood of

success on the merits of his claim.[29]

Standard Operating Procedure No. 20-01-01 of the Mississippi Department of

Corrections establishes that

> [a]ny physician, psychologist, sociologist or any other persons obtained by an
> offender's attorney of record to interview, evaluate or otherwise consult with the
> offender must submit to the normal protocol for attorney of record visits *with the
> exception that a court order must be obtained prior to setting up the visit.*[30]

In Turner's view, this requirement erects an unconstitutional barrier to his right of access

to courts and amounts to a violation of his right to due process.

Turner is correct that the substantive aspect of the Fourteenth Amendment's Due Process

---

*Gholson v. Estelle*, 675 F.2d 734, 737 (5th Cir. 1982). This Court fully understands that the
question is not whether Turner received the "full force of the protections and safeguards
guaranteed by the Constitution" prior to his condemnation; all previous courts which have
addressed this question have found that he did. *See* nn.1-9, *supra*. The issues before this Court
are (1) whether Turner faces irreparable injury due to the State's policy and actions under MDOC
SOP No. 20-01-01; (2) whether the policy and actions violate his rights promised him under the
Fourteenth Amendment to the United States Constitution; and (3) whether this Section 1983
action is the appropriate vehicle, *see Skinner v. Switzer*, ___ U.S. ___, 131 S.Ct. 1289 (2011),
through which to request action from this Court.

[29] A claim under Section 1983 is composed of three elements: "(1) a deprivation of a right
secured by federal law (2) that occurred under color of state law, and (3) was caused by a state
actor." *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004). The parties do not dispute
the second and third elements. Therefore, for the purposes of addressing Turner's likelihood of
success on the merits, this opinion focuses on whether the State has inflicted a deprivation of a
right secured by federal law.

[30] Exhibit 1 to Complaint [Docket No. 1-1] at 4 (emphasis added).

Clause establishes a right of access to courts,[31] and it is no simple triviality. There exists in our legal system a "judicial attitude that the right of access to the courts is afforded special protection."[32] Moreover, "[a]n inmate's right of unfettered access to the court is as fundamental a right as any other he may hold . . . . All other rights of an inmate are illusory without it[.]"[33]

But the right does not begin and end with permission to walk physically through the courthouse doors; courts have roundly recognized that the Due Process Clause also protects a would-be litigant's right to prepare for suit. For example, in the 1977 case of *Bounds v. Smith*, the Supreme Court observed as "indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents[,] with notarial services to authenticate them, and with stamps to mail them."[34] In 1996, the Ninth Circuit held that an inmate could challenge the Alaska Department of Corrections' refusal to photocopy legal documents as a violation of the right of access to courts.[35] And in 1989, a district judge in Tennessee held that the Shelby County Jail violated inmates' right of access to courts by maintaining an inadequate prison library and by failing to establish any form of legal services, other than counting among its

---

[31] *Sotto v. Wainwright*, 601 F.2d 184, 190-91 (5th Cir. 1979) (citing *NAACP v. Button*, 371 U.S. 415 (1963)).

[32] *Taylor v. Sterrett*, 532 F.2d 462, 470 (5th Cir. 1976) (abrogated on other grounds, *Brewer v. Wilkinson*, 3 F.3d 816, 825 (5th Cir. 1993)).

[33] *Taylor*, 532 F.2d at 470 (quoting *McCrary v. Sullivan*, 509 F.2d 1132, 1337 (5th Cir. 1975)).

[34] *Bounds v. Smith*, 430 U.S. 817, 824-25 (1977) (Marshall, J.) (overruled in part by *Lewis v. Casey*, 518 U.S. 343 (1996) (Scalia, J.)).

[35] *Hiser v. Franklin*, 94 F.3d 1287, 1289 (9th Cir. 1996).

9

overcrowded population two "jailhouse lawyers."[36]

It does not escape this Court's recognition that the Supreme Court later pared its *Bounds* decision by holding in *Lewis v. Casey* that

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigation engines. . . . The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.[37]

Additionally, the *Lewis* Court counseled that "a prison regulation impinging on inmates' constitutional rights is valid if it is reasonably related to legitimate penological interests."[38] But conversely, "when a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights."[39]

Even as framed by *Lewis*, the constitutional right of access to courts protects the species of request made by Turner: for prison officials to provide a tool – namely, access to Dr. Schwartz-Watts – in order to attack his death sentence collaterally. In reaching that decision, this Court relies heavily on Judge Easterbrook's instructive opinion in *Ivey v. Harney*.[40] In *Ivey*, the inmate plaintiff brought a Section 1983 suit in which he challenged the adequacy of medical care provided after he slipped and fell in the prison where he was housed. Ivey's attorney determined

---

[36] *Gilland v. Owens*, 718 F. Supp. 665, 688-89 (W.D. Tenn. 1989).

[37] *Lewis*, 518 U.S. at 355.

[38] *Id.* at 361.

[39] *Taylor*, 532 F.2d at 469 (quoting *Martinez v. Procunier*, 416 U.S. 396, 405-06 (1974)). *But see Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989).

[40] *Ivey v. Harney*, 47 F.3d 181 (7th Cir. 1995) (Easterbrook, J.).

that expert medical evidence would be necessary to prosecute the claim, and the district judge ordered the state Department of Corrections, which was not a party to the case, to transport Ivey to a physician some 200 miles away.[41] The Department appealed, and although the Seventh Circuit ultimately reversed the district judge, it did so upon holding that the All Writs Act,[42] on which the district court had relied, did not empower the court to order Ivey's custodian "to transport the prisoner outside the prison to acquire evidence in a suit to which the custodian is not a party."[43]

More importantly, Judge Easterbrook rested his decision heavily on the observation that "[n]othing in the common law supports an order directing a third party to provide free services that facilitate litigation."[44] But different circumstances would have commanded a different outcome, as Judge Easterbrook explained:

> If the Illinois Department of Corrections proposed to block a physician from examining Ivey, a district judge might properly employ [the All Writs Act]. Prisoners have constitutional rights of access to the courts, and as a prison must permit legal mail to come and go, so it must permit lawyers and physicians access to the prisoner. Access satisfies the constitutional requirement, however: the prison may require the lawyer to visit the prisoner, rather than escorting the prisoner to his lawyer's office.[45]

In the case at bar, the pieces missing from Ivey's puzzle are present in Turner's: he is requesting that the Court order a defendant, rather than a third party, to arrange for his

---

[41] *Id.* at 182.

[42] 28 U.S.C. § 1651.

[43] *Ivey*, 47 F.3d at 186.

[44] *Id.* at 185.

[45] *Id.* at 186.

examination, and he has fallen victim to prison officials' attempts to block his access to a psychiatrist outright.

Moreover, at this juncture, the State has failed to explain how the court-order requirement contained in Standard Operating Procedure No. 20-01-01 is reasonably related to legitimate penological interests. Undoubtedly, maintaining security is a legitimate concern for every correctional facility, but requiring medical professionals and other non-lawyers, who have been obtained by the offender's attorney to interview the offender, to receive a court order prior to meeting with an inmate does not effectuate that goal. In briefing and at oral argument on this matter, the State has not enunciated any practical, security-related result of requiring lawyer-obtained doctors to secure a court order, and this Court likewise has been unable to conceive of one. The State has offered the affidavit of Paul Richard Pennington, the director of inmate legal assistance at the Mississippi State Penitentiary, who avers that "[v]isits between death row prisoner and non-lawyers *often* involve contact visits and the introduction of special items into a secure prison facility which pose special dangers."[46] The Court has no doubt that this is true, but a court order authorizing a meeting between an inmate and a non-lawyer does nothing to alleviate those concerns. Indeed, the Department of Corrections has other policies in place to address that issue – namely, its requirement that every person visiting an inmate submit to a physical search

---

[46] Exhibit 2 to State's Memo [Docket No. 12-2] at 2 (emphasis added). The obvious flaw in Pennington's explanation is that it assumes that there must be physical contact between every medical professional (or other person) and the inmate. Indeed, like a paralegal, who, as the State argued at the hearing is excluded from this policy, some medical professionals or other duly licensed persons will only need to see, hear, and observe the inmate and to take down information with a pencil and a legal pad or medical tablet without any physical contact with the inmate.

of his person and the items within his control.[47]

Given the realities of Mississippi geography, an inmate at the Mississippi State Penitentiary might find himself some 300 miles from a state court of competent jurisdiction. It is difficult to understand what security-related aspect of a doctor-inmate meeting the State expects a judge so far from the penitentiary to pass on. In truth, there appears to be none. Therefore, the Court is satisfied that Turner has shown a substantial likelihood of successfully demonstrating that the court-order requirement enjoys no reasonable relationship to a legitimate penological interest and, therefore, represents an unconstitutional impingement on Turner's right of access to courts.

The State has offered a handful of arguments in opposition to Turner's motion, none of which is compelling. Preliminarily, the Court is comfortable in its conclusion that it enjoys jurisdiction over the subject matter of this dispute.[48] Likewise, the Court declines to endorse the State's theory that Turner is time-barred from pursuing his claim. According to the State, the policy at issue in the case at bar was in place at the time of Turner's incarceration; therefore, in the State's view, the three-year statute of limitations began running at the moment Turner became an MDOC inmate.[49] But the State offers no authority supporting that position, and the Court is unaware of any. Taken to its logical extreme, such a rule would immunize constitutional tortfeasors against legal challenges so long as they acted pursuant to a policy that had been on the

---

[47] *See* Exhibit 3 to Complaint [Docket No. 3-1] at 5 (discussing physical searches of attorneys and paralegals).

[48] *Supra* at n.17.

[49] This is the State's only articulated theory related to a time bar. *See* State's Memo at 25-27.

13

books for longer than the span of the limitations period. That position is not supported by reason, and the degree to which it flies in the face of Section 1983's core purpose is obvious. Finally, the State takes the awkward position, which apparently is endorsed by the Mississippi Supreme Court,[50] that Turner should have asked the Governor to allow him access by his medical experts.[51] Even the Governor, though, is without power to provide a "court order," which is what the policy plainly requires.[52]

Fundamentally, though, the State's chief objection to Turner's motion is its contention that Turner already has litigated the issue of his mental competency.[53] That argument misses an important point: this case is not a collateral attack on Turner's sentence but is, instead, a Section

---

[50] Exhibit 6 to Plaintiff's Motion for Temporary Restraining Order and, [*sic*] Preliminary Injunction [Docket No. 3-10].

[51] State's Memo at 31.

[52] Certainly, this is not to say that the Governor, when presented with a request for clemency, cannot dictate what information must be assembled by a petitioner in order for his petition to be considered. As noted by the late Presiding Justice of the Mississippi Supreme Court, Michael Sullivan, "[t]he consideration of executive clemency is especially arbitrary since it is usually based on popular opinion, political aspirations, the moral courage of the decision maker, and other factors." *Wiley v. State*, 691 So.2d 959, 977 (Miss. 1997) (dissenting, joined by Banks and McRae, JJ.) (citing Daniel T. Kobil, *Due Process in Death Penalty Commutations: Life, Liberty, and the Pursuit of Clemency*, 27 U. Rich. L. Rev. 201, 226 (1993)). However, even a decision to deny clemency must comport with some minimal level of procedural due process. *See Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 288, 118 S.Ct. 1244, 153 (1998) (O'Connor, J.) (concurring in part and concurring in judgment and joined by Souter, Ginsburg and Breyer, JJ.). Turner "remains a living person and consequently has an interest in his life." *Id*. Stated another way, he "has not been deprived of all interest in his life before his execution." *Id*. at 289. Turner, therefore, must be allowed access to those who will assist him in protecting his life whether the ultimate audience is composed of justices, the Governor, or the parole board. To be sure, the State has not presented a justifiable reason that Turner should obtain a court order prior to access to experts.

[53] *See* State's Memo at 12-25.

14

1983 suit. The distinction is crucial, just as it was when the U.S. Supreme Court addressed the case of *Skinner v. Switzer*[54] less than a year ago. In *Skinner*, a Texas inmate on death row filed suit under Section 1983 seeking access to crime-scene evidence for the purpose of DNA testing. His prosecutors argued that the case should be dismissed because Skinner's ultimate goal was to use the fruits of his suit to attack the legitimacy of his conviction; in the view of the prosecutors, such a result would run afoul of the well established rule that a litigant may not use Section 1983 to imply the invalidity of a conviction or sentence.[55]

But the Court permitted Skinner to proceed with his case because "[s]uccess in his suit for DNA testing would not 'necessarily imply' the invalidity of his conviction."[56] As Justice Ginsburg explained, "[w]hile test results might prove exculpatory, that outcome is hardly inevitable; . . . results might prove inconclusive or they might further incriminate Skinner."[57] Moreover, as the *Skinner* Court observed, *habeas corpus* was not only an unnecessary vehicle for Skinner's particular pursuit of relief but was, more likely, altogether inappropriate because "the relief sought would 'neither terminate custody, accelerate the future date of release from custody, nor reduce the level of custody.'"[58]

Like Skinner, Turner has not brought the suit at bar to attack his sentence; he is concerned

---

[54] *Skinner v. Switzer*, ___ U.S. ___, 131 S. Ct. 1289 (2011). The State candidly admitted at the February 3 hearing that it was unprepared to argue *Skinner*'s relevance to the case at bar.

[55] *See id.* at 1298-99 (citing *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)).

[56] *Skinner*, 131 S. Ct. at 1298 (quoting *Heck*, 512 U.S. at 487).

[57] *Skinner*, 131 S. Ct. at 1298.

[58] *Skinner*, 131 S. Ct. at 1299 (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 86 (2005) (Scalia, J., concurring)).

only with pursuing evidence in the hope of later attacking that sentence and/or laying a foundation for a request for clemency. And like Skinner, the evidence Turner seeks might prove helpful in that effort, might prove unhelpful, or might impart no effect at all. But that determination is not for this Court to make. The only question at hand is whether Turner's constitutional right of access to courts entitles him to prepare for that litigation by meeting with a doctor obtained by his attorney without first procuring a court order. Skinner has demonstrated a substantial likelihood of proving that this question must be answered in the affirmative.

Lastly, the Court holds that Turner has not "delayed unnecessarily in bringing the claim."[59] To say nothing of the recent developments in fMRI technology,[60] Turner applied to the Mississippi Supreme Court for a court order at a time when his execution had not been scheduled, and after that court denied Turner's request and scheduled his execution, he filed suit in this Court a mere four days later. Whatever delay has transpired since the filing of the motion for injunctive relief on January 31, 2012, is attributable only to this Court and cannot be held against Turner as evidence of dilatory litigation.[61]

## CONCLUSION

For the purpose of absolute clarity, the Court reiterates what this holding is and what it is not. This Court agrees with Turner that he has shown a substantial likelihood of success on the merits of his Section 1983 claim and that he has satisfied the other requirements for issuance of

---

[59] *Nelson v. Campbell*, 541 U.S. 637, 650 (2004).

[60] *See generally* Rebecca Krauss, *Neuroscience and Institutional Choice in Federal Sentencing Law*, 120 Yale L.J. 367 (Nov. 2010).

[61] *See Hill v. McDonough*, 547 U.S. 573, 584 (2006).

injunctive relief. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution,"[62] and prison officials are not free to forbid inmates from visiting with doctors obtained by their attorneys when the requirement is not reasonably related to legitimate penological interests. But this Court passes no judgment on the imminent question of whether the evidence Turner seeks commands the vacation of his death sentence.

For now, though, that question is immaterial. Because the execution scheduled for February 8, 2012, would eviscerate this Court's ability to render a meaningful decision on the merits of Turner's Section 1983 claim, Turner's motion for injunctive relief is GRANTED, and the defendants are hereby ENJOINED from carrying out Turner's execution, currently scheduled for February 8, 2012.

For the reasons herein stated, this Temporary Restraining Order shall remain in effect for a period of fourteen days, up to the time of day corresponding to this Order's entry on Monday, February 20, 2012. Prior to the conclusion of that time period, the Court will convene a conference of the parties' attorneys for the purpose of determining whether good cause exists to extend the injunction for a like period or whether the State consents to a longer extension.

SO ORDERED this Sixth day of February 2012 at 2:30 p.m.

/s/ *Carlton W. Reeves*

Hon. Carlton W. Reeves
United States District Court Judge

---

[62] *Turner v. Safley*, 482 U.S. 78, 84 (1987).

17